REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William W. Flachsbart (admitted pro hac vice)
wwf@fg-law.com
Robert P. Greenspoon (admitted pro hac vice)
rpg@fg-law.com
Jonathan Hill (admitted pro hac vice)
jh@fg-law.com
FLACHSBART & GREENSPOON, LLC
333 N. Michigan Avenue, Suite 2700
Chicago, Illinois 60603
312-551-9500
Fax: 312-551-9501

Lewis E. Hudnell, III (CASBN 218736)
Hudnell Law Group P.C.
800 W. El Camino Real, Suite 180
Mountain View, California 94040
T: 650.564.7720
F: 347.772.3034
lewis@hudnelllaw.com

Attorneys for Plaintiff
SMART WEARABLE TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| SMART WEARABLE TECHNOLOGIES INC., <br><br> Plaintiff, <br><br> v. <br><br> FITBIT, INC. <br><br> Defendant. | Case No. 3:17-cv-05068-VC <br><br> **OPPOSITION TO RENEWED MOTION FOR RULE 11 SANCTIONS** <br><br> Date: May 10, 2018 <br> Time: 10:00 a.m. <br> Ctrm: 4, 17th Floor <br><br> Hon. Vince Chhabria |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................1

II.   FITBIT'S MOTION FOR SANCTIONS SHOULD BE DENIED ..................................2

      A.   Rule 11 Is Not Intended To Punish Parties For Losing ........................2

      B.   SWT's Complaints Complied With Rule 11 ..........................................4

           1.   SWT's Pre-Suit Investigation Was Reasonable..........................4
           2.   SWT was not required to assume Fitbit's literature was inaccurate ..........5
           3.   SWT developed a good faith basis for its complaints ...............7

      C.   SWT's Signature On The Joint Case Management Conference Statement
           Complied With Rule 11 ....................................................................10

      D.   SWT's Opposition To Summary Judgment Complied With Rule 11 .................13

           1.   SWT was not required simply to accept Fitbit's "evidence" as true.........13
           2.   Discovery after the CMC Statement made the facts less certain, not more14
           3.   Inconsistencies between the initial PICs and the accused devices do not
                demonstrate that the underlying claim of infringement was frivolous......17
           4.   SWT's opposition to summary judgment was not frivolous ...................19

III.  TO THE EXTENT ANY SANCTIONS ARE WARRANTED, FITBIT HAS FAILED
      TO PROVIDE A SUFFICIENT RECORD TO AWARD THEM....................................22

      A.   Fitbit's Arguments For "Material" Sanctions Are Baseless................22

      B.   Fitbit Has Provided The Court With No Way To Calculate Its Fees With
           Reference To Each Challenged Pleading........................................24

IV.   CONCLUSION ..........................................................................................25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF AUTHORITIES

*Cases*

*Alco Standard Corp. v. Tennessee Valley Auth.*,
 808 F.2d 1490 (Fed. Cir. 1986) ...................................................................................6

*Benedict v. Hewlett-Packard Co.*,
 No. 13-CV-00119-LHK, 2014 U.S. Dist. LEXIS 7323 (N.D. Cal. Jan. 21, 2014) ...............3, 7

*C.W. v. Capistrano Unified Sch. Dist.*,
 784 F.3d 1237 (9th Cir. 2015) ...................................................................................3

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
 418 F.3d 1225 (Fed. Cir. 2005) ...................................................................................6

*Cooney v. Casady*,
 735 F.3d 514 (7th Cir. 2013) ...................................................................................25

*Creagi, Inc. v. Pinnaclife, Inc.*,
 No. 11-CV-6635-LHK, 2014 U.S. Dist. LEXIS 77484 (N.D. Cal. June 3, 2014) ......... 3, 4, 6, 9

*Daubert v. Merell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) ...................................................................................14

*Doering v. Union Cty. Bd. of Chosen Freeholders*,
 857 F.2d 191 (3d Cir. 1988) ...................................................................................23

*ERBE Elektromedizin GmbH v. Canady Technology LLC*,
 629 F.3d 1278 (Fed. Cir. 2010) ...................................................................................4

*Glob. Touch Sols., LLC v. Toshiba Corp.*,
 109 F. Supp. 3d 882 (E.D. Va. 2015)...................................................................................23

*Glycobiosciences, Inc. v. Innocutis Holdings, LLC*,
 146 F. Supp. 3d 221 (D.D.C. 2015) ...................................................................................14

*Hunt v. PNC Bank*,
 No. SACV 16-02093, 2017 U.S. Dist. LEXIS 171841 (C.D. Cal. Mar. 23, 2017) .................25

*Hussey v. Chase Manhattan Bank*,
 No. 02-7099, 2004 U.S. Dist. LEXIS 1150 (E.D. Pa. Jan. 13, 2004) .....................................13

*ID Sec. Sys. Can., Inc. v. Checkpoint Sys.*,
 198 F. Supp. 2d 598 (E.D. Pa. 2002) ...................................................................................14

*iLOR, LLC v. Google, Inc.*,
 631 F.3d 1372 (Fed. Cir. 2011) .............................................................................4, 5, 9

*Judin v. United States*,
 110 F.3d 780 (Fed. Cir. 1997) ...................................................................................6

*Kaneka Corp. v. Xiamen Kingdomway Group Co.*,
 790 F.3d 1298 (Fed. Cir. 2015) ...................................................................................4

ii

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*,
   554 F.3d 1010 (Fed. Cir. 2009) ...................................................................................21

*Lava Trading Co. v. Sonic Trading Mngmt., LLC*,
   45 F.3d 1348 (Fed. Cir. 2006) .....................................................................................19

*Merritt Forbes Co. v. Newman Inv. Sec., Inc.*,
   604 F. Supp. 943 (S.D.N.Y. 1985)..............................................................................14

*Miltier v. Downes*,
   935 F.2d 660 (4th Cir. 1991) .......................................................................................25

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000) .....................................................................................19

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*,
   467 F.3d 1355 (Fed. Cir. 2006) ...................................................................................18

*PharmaStem Therepeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007) .....................................................................................6

*Phillips Petroleum Co. v. Esso Standard Oil Co*.,
   91 F. Supp. 215 (D. Md. 1950).....................................................................................23

*PrinterOn Inc. v. Breezyprint Corp.*,
   93 F. Supp. 3d 658 (S.D. Tex. 2015) ...........................................................................19

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
   360 F.3d 1295 (Fed. Cir. 2004) ...........................................................................passim

*Rohm & Haas Co. v. Brotech Corp.*,
   127 F.3d 1089 (Fed. Cir. 1997) ...................................................................................21

*Sharnese v. California*,
   547 F. App'x 820 (9th Cir. 2013) ................................................................................25

*Syneron Med. Ltd. v. Viora Ltd.*,
   No. 2:14-cv-00639, 2014 U.S. Dist. LEXIS 172015 (E.D. Tex. Dec. 12, 2014) .........5

*Tritek Techs., Inc. v. United* States,
   63 Fed. Cl. 740 (Fed. Cl. 2005) ..................................................................................18

*United States v. Phillipos*,
   849 F.3d 464 (1st Cir. 2017).......................................................................................14

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*
   208 F.3d 981 (Fed. Cir. 2000) .................................................................................3, 6

*Vodak v. City of Chicago*,
   No. 03 C 2463, 2004 U.S. Dist. LEXIS 18070 (N.D. Ill. Sept. 9, 2004) ..................14

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

***Rules***

Fed. R. Civ. P. 11 ................................................................................................ passim

Fed. R. Civ. P. 11 Advisory Committee Notes ............................................................. 3

Fed. R. Civ. P. 26(e)(1)(A) ........................................................................................ 20

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## I.    INTRODUCTION

The summary judgment proceeding in this case was a contest between circumstantial evidence and purported direct evidence. It was reasonable for Plaintiff Smart Wearable Technologies, Inc. ("SWT") to believe Fitbit's own product literature and advertising. It was reasonable for SWT not to immediately change "gyroscope" to "magnetometer" to describe the second sensor in the Blaze when it was revealed that Fitbit's public statements were wrong. It was reasonable for SWT to infer that Fitbit used the sensors in its products and would not have included non-functional components. It was reasonable for SWT to be suspicious of Fitbit's protestations of innocence, particularly when Fitbit was resisting production of basic technical documents. It was reasonable for SWT to dispute the declaration testimony of Fitbit's witness after, at his deposition, he admitted a lack of personal knowledge, recanted several mistaken assertions, and confessed he had not reviewed all relevant code.

SWT's efforts were unsuccessful. But they were by no means frivolous.

Fitbit makes two arguments about the merits. First, it repeats its summary judgment argument that its products are not capable of infringing because they do not collect information with six degrees of freedom. We do not intend here to relitigate the Court's decision on summary judgment. But we respectfully suggest that it was not the only decision that the Court could have reached. Fitbit was not as open (or as accurate) in its representations to SWT or the Court as it now suggests. From the available information, SWT formed reasonable inferences that Fitbit's Surge and Blaze practiced the claim limitations at issue on summary judgment.

<u>Regarding the Surge:</u>

- Fitbit's grounds for claiming that it does not calculate the claimed 6-DOF information required the Court to accept that neither of two sensor chips, and none of the four sensors on these two chips, ever gets activated. The assertion is implausible for a mass-produced consumer product. (Declaration of Bryan Bergeron filed herewith ¶ 39.)

- Under cross-examination, Fitbit's sole employee-witness (Logan Niehaus) **retracted** the **only** reason his summary judgment declaration gave for stating that Fitbit's 3-axis gyroscope chip never gives data to the processor – calling his own declaration ███████

1

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

██████████████ on this issue. (Declaration of Robert Greenspoon filed herewith Ex. A, at 142:12-154:12.)

- Fitbit's own Surge marketing and product literature named to consumers the 3-axis gyroscope as an included part, and Fitbit never showed those materials (as to the Surge) to be inaccurate. (Greenspoon Decl. Ex. B, at 12 (PICs reproducing manual page)).

Regarding the Blaze:

- Fitbit's grounds for noninfringement required the Court to accept that a 3-axis magnetometer chip never gets activated. (Greenspoon Decl. Ex. A, at 61:2-17.)

- Under cross-examination, Mr. Niehaus confirmed that his testimony about sensor interactions in the Blaze source code was ██████████████████████ ██████████████████████████████ ███████████ – *i.e.*, he acted as an employee-expert to consider otherwise-unfamiliar materials and render testimonial opinions about what he concluded from them. (Greenspoon Decl. Ex. A, at 138:5-24; 196:13-197:9.) Mr. Niehaus's knowledge gaps substantially lowered his credibility to do this.

- Mr. Niehaus could not fathom why the Blaze (or the Surge) ████████████ ████████████. (Greenspoon Decl. Ex. A, at 136:13-137:6; 139:14-24.)

Second, Fitbit argues for the first time in its sanctions motion that its products do not meet limitation (g) of claim 8, which Fitbit construes as requiring a very specific type of information display inconsistent with the patent's preferred embodiment. This issue has not been litigated. SWT's position on these issues is by no means frivolous. The Court should deny Fitbit's motion for Rule 11 sanctions.

## II.     FITBIT'S MOTION FOR SANCTIONS SHOULD BE DENIED

### A.     RULE 11 IS NOT INTENDED TO PUNISH PARTIES FOR LOSING

In considering Rule 11 sanctions in patent cases, the Court "should 'avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted.'" *Creagi, Inc. v. Pinnaclife, Inc.*, No. 11-CV-6635-LHK, 2014 U.S. Dist. LEXIS 77484, at *13 (N.D. Cal. June 3,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

2014) (citing Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendments)). The test for patent cases brought in the 9th Circuit is whether the paper is "frivolous" or "filed with the court for an improper purpose." *Id.* at *14. A "nonfrivolous claim is never filed for an improper purpose." *C.W. v. Capistrano Unified Sch. Dist.*, 784 F.3d 1237, 1248-49 (9th Cir. 2015) (citation omitted) (defining "improper purpose" as "tested by objective standards," and found where a paper other than a complaint is filed "in the context of a persistent pattern of clearly abusive litigation activity.").[1] The Rule 11 standard "is not a high one;" a claim that has some plausible basis, even a weak one, is sufficient to avoid sanctions. *Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119-LHK, 2014 U.S. Dist. LEXIS 7323, at *18 (N.D. Cal. Jan. 21, 2014) (citations omitted). "Further, circumstantial evidence, and the reasonable inferences drawn from that evidence, are treated as evidentiary support for purposes of Rule 11." *Id.* at *18-19 (citations and internal quotation omitted).

A claim is "frivolous" only when it is "*both* baseless, *and* brought without a reasonable and competent inquiry." *Creagi, Inc.*, 2014 U.S. Dist. LEXIS 77484, at *14-15 (citation omitted). Courts deny sanctions if a complaint was *either* not baseless from an objective perspective, *or* was based on a reasonable and competent inquiry before filing. *Id.* at *15. A proper pre-filing patent investigation, in turn, requires "at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Id.* (quoting *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300 (Fed. Cir. 2004)). A pre-filing investigation is adequate where it includes reviewing the defendant's advertising and comparing claims of the patent with the accused product, even if there had been no scientific analysis of the product itself. *Id.* at *23-27 (citing the holding of *Q-Pharma*, after reviewing and harmonizing the "two leading cases on pre-filing inquiry" – *Q-Pharma* and *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981 (Fed. Cir. 2000)).

---

[1]    Fitbit's "improper purpose" argument merely rehashes its "frivolousness" argument, insisting *ipse dixit* that SWT's motive was improper because, in Fitbit's self-serving view, there was no basis for the claim. (ECF No. 130, at 19.) As discussed below, SWT had a reasonable basis for its challenged pleadings and thus did not act for an improper purpose.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   If claim interpretation is at issue, the Court does not assess whether the plaintiff was

2   "correct," but only whether its position was nonfrivolous. *Creagi, Inc.*, 2014 U.S. Dist. LEXIS

3   77484, at \*15-16 (noting from *Q-Pharma* that "[c]laim interpretation is not always an exact

4   science, and it is not unusual for parties to offer competing definitions of even the simplest claim

5   language."). A claim interpretation is nonfrivolous, even where wrong, if it was based on

6   intrinsic evidence and the canons of claim construction. *iLOR, LLC v. Google, Inc.*, 631 F.3d

7   1372, 1379 (Fed. Cir. 2011); *see also ERBE Elektromedizin GmbH v. Canady Technology LLC*,

8   629 F.3d 1278, 1284, 1292 (Fed. Cir. 2010) (finding claim construction not frivolous even

9   though wrong, when based on arguments for ordinary and customary meaning, the doctrine of

10   claim differentiation, the impropriety of assuming disclaimers, and the impropriety of importing

11   qualitative limitations). One such canon (relied upon by SWT) is that a claim interpretation that

12   excludes the preferred embodiment (like Fitbit's) is rarely, if ever, correct. *See Kaneka Corp. v.*

13   *Xiamen Kingdomway Group Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015).

14   **B.   SWT'S COMPLAINTS COMPLIED WITH RULE 11**

15   Fitbit argues that SWT violated Rule 11 by filing the Complaint on November 14, 2016,

16   and the First Amended Complaint on April 18, 2017. Its arguments about both filings are the

17   same: Fitbit contends that SWT conducted an inadequate prefiling investigation, that the accused

18   devices cannot collect 6-DOF information, and that the accused devices do not display

19   synchronized information under Fitbit's interpretation of limitation (g) of Claim 8 (an issue first

20   raised in Fitbit's Rule 11 motion). These arguments have no merit.

21   **1.   SWT's Pre-Suit Investigation Was Reasonable**

22   SWT's pre-filing investigation took place over an eleven-month period and included

23   several discussions with a named inventor of U.S. Patent No. 6,997,882 (the "'882 Patent").

24   SWT and its attorneys reviewed the disclosure and claims of the '882 Patent along with its

25   prosecution history. The intrinsic evidence informed the constructions of the terms within the

26   asserted claim of the '882 Patent. Counsel then applied these constructions as part of a

27   limitation-by-limitation comparison of claim 8 of the '882 Patent to the fitness tracker products

28   offered by Fitbit, including the Surge and Blaze products along with other fitness trackers that

4

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   SWT ultimately did not include in its Complaint. (Declaration of Corby Vowell filed herewith ¶¶
2   5-9.)

3          SWT and its attorneys reviewed publicly available product literature relating to the
4   components, features, and functionality of all Fitbit products as well as the Fitbit App, which is
5   configured for use with the accused products. The documentation reviewed included product
6   specifications, user manuals, product descriptions, and marketing materials describing Fitbit's
7   products. These materials indicated that some Fitbit products, namely the Surge and Blaze,
8   included component configurations accommodating collection of movement data from which 6-
9   DOF data may be derived. (Vowell Decl. ¶¶ 5-9.) Further, the documentation supplied a
10  reasonable inference that the accused products use this data, along with sensed physiological
11  data, as part of their calculating and reporting various health metrics and fitness tracking
12  summary information to users such as, for example, calories burned. (Bergeron Decl. ¶¶ 27-34.)
13  Although Fitbit contends that a pre-suit acquisition and teardown of the accused products would
14  have led to the discovery of noninfringement, Fitbit overlooks that SWT would have discovered
15  only confirmatory information: *i.e.*, that each device contains a second 3-axis sensor (in one case
16  not a gyroscope) capable of 6-DOF detection.[2]

17               **2.      SWT was not required to assume Fitbit's literature was inaccurate**

18         It is a commonplace, nonfrivolous, and accepted practice to rely on advertising and other
19  public statements in lieu of physical product analysis – even as to products that might be easily
20  obtained. *See iLOR, LLC*, 631 F.3d at 1379; *Q-Pharma*, 360 F.3d at 1302-03; *Syneron Med. Ltd.*
21  *v. Viora Ltd.*, No. 2:14-cv-00639, 2014 U.S. Dist. LEXIS 172015, at *13-15 (E.D. Tex. Dec. 12,
22  2014) (denying Rule 11 sanctions over pre-filing investigation reviewing advertising and public
23  statements). Fitbit suggests that easy obtainability of a product creates a *per se* rule against

24

25  _____
    [2]      Even accepting that a teardown and testing of the Surge might indicate that the nine-axis
26  sensor is inactive, there remains a second accelerometer capable with proper programming, in
    conjunction with the primary accelerometer, of calculating the claimed 6-DOF information.
27  (ECF No. 95-1, at ¶ 13; ECF No. 80-54, at ¶ 5). Moreover, a $30,000 teardown is a poor
    substitute for the actual technical documents which are not prone to reverse engineering errors.
28  (Bergeron Decl. ¶¶ 21, 25.)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   reliance on public statements, and requires some sort of physical product analysis. (ECF No. 130,

2   at 12:13-15.) The Federal Circuit's *Q-Pharma* decision renders this argument plainly wrong. In

3   *Q-Pharma*, the plaintiff had the accused product before suit but did not chemically analyze it,

4   instead proceeding on the basis of the defendant's public statements, and the absence of any

5   expectation that testing would reveal anything different. The Federal Circuit rejected Fitbit's

6   argument, holding that no pre-suit chemical test was required because Q-Pharma relied on

7   Jergen's advertising and labeling of the accused product. *Q-Pharma*, 360 F.3d at 1302-03.

8          *Q-Pharma*'s rejection of Fitbit's argument also finds support in the law governing what

9   types of information constitute evidence of infringement. A company's own marketing and

10  product literature constitutes evidence of product structure and operation. *PharmaStem*

11  *Therepeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1351 (Fed. Cir. 2007) ("[T]here is no

12  prohibition against using the admissions of a party, whether in the form of marketing materials or

13  otherwise, as evidence in an infringement action; such admissions are entitled to weight along

14  with all other evidence of infringement."); *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d

15  1225, 1233 (Fed. Cir. 2005) (marketing materials that touted the capability of the allegedly

16  infringing systems supported the jury's verdict of infringement); *Alco Standard Corp. v.*

17  *Tennessee Valley Auth.*, 808 F.2d 1490, 1502-03 (Fed. Cir. 1986) (marketing materials supported

18  a finding of infringement, describing aspects of the allegedly infringing device in terms almost

19  identical to the patent claim language). This is not surprising. Litigation risks associated with

20  publishing misleading or untrue statements make published vendor statements inherently reliable

21  and accurate descriptions, until proven otherwise through the adversarial process.

22         Fitbit's cited decisions are not to the contrary. In *View Engineering*, the Federal Circuit

23  held that the attorney's failure to compare construed claims with the accused product embodied

24  the Rule 11 violation – not the reliance on advertising statements. *Creagi, Inc.,* 2014 U.S. Dist.

25  LEXIS 77484, at *23-27. In *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997), the

26  Federal Circuit held that the sanctionable aspect was the attorney's ignorance at relevant times of

27  the accused product's "actual design and functioning," plus his failure to compare construed

28  claim limitations against it. The Federal Circuit said nothing that would rule out advertising and

6

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  product literature providing adequate knowledge of a product's "design and functioning." *Id.*

2      There is nothing frivolous about assuming that Fitbit correctly described its own product.

3  *Q-Pharma*, 360 F.3d at 1302-03; *Benedict*, 2014 U.S. Dist. LEXIS 7323 at *18-19.

### 3.    SWT developed a good faith basis for its complaints

5      Prior to drafting its Complaint, SWT and its attorneys created claim charts for the Surge

6  and Blaze products, submitted previously to the Court. (Vowell Decl. ¶¶ 9, 15-16 and Exs. A, B.)

7  The charts show the result of SWT's pre-filing investigation. The charts compare information

8  obtained for each product to the limitations of the asserted claim. Because direct Fitbit

9  statements, and reasonable inferences from them, permitted SWT and its counsel to find each

10  and every limitation of clam 8 in the products, the result of the investigation showed

11  infringement of the asserted claim.

12      Regarding the 6-DOF limitation, an objective basis existed to form the conclusions that

13  SWT and its attorneys reached. The post-judgment expert declaration of Dr. Bryan Bergeron

14  shows that this is so. Dr. Bergeron is the author of *Teardowns*, and is an expert in reverse

15  engineering consumer electronic products, source code reviews, and health devices and

16  wearables. (Bergeron Decl. ¶¶ 1-10.) Dr. Bergeron considered the facts revealed in materials

17  available to SWT before filing suit – namely the advertised presence of both a 3-axis

18  accelerometer and a 3-axis gyroscope in the Surge and Blaze. (Bergeron Decl. ¶¶ 27-30.)

19      Dr. Bergeron concluded that it is reasonable to infer that a consumer product company

20  would not install a particular sensor chip in a mass produced device if it did not use it, and would

21  not advertise its presence to the public if it were not there or were unused. (Bergeron Decl. ¶¶

22  31-33 (citing cost and other considerations).) In the context of how the Surge and Blaze operate,

23  it was also reasonable to infer that the advertised 3-axis gyroscope sensors provide data that gets

24  used with the 3-axis data of the other sensor, to perform basic 6-DOF functions and calculations

25  of the device, such as step counting, calorie burn, etc. (Bergeron Decl. ¶ 34.) That said, Dr.

26  Bergeron recognized that opposite conclusions were not impossible – just implausible based on

27  the combination of information available to SWT's attorneys. (Bergeron Decl. ¶¶ 35-37.)

28

7

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

As for the "synchronized display" limitation, Fitbit first mentioned this issue in its original Rule 11 motion. (ECF No. 102.) Fitbit did not raise it in its May 26, 2017 letter (ECF No. 130-10), in its portion of the joint CMC statement (ECF No. 68), or in its motion for summary judgment (ECF No. 80). The parties never exchanged proposed claim constructions because Fitbit instead moved for an early summary judgment.

SWT's preliminary infringement contentions ("PICs"), served April 7, 2017, identified (with red underlining) that display of calorie burn information embodied the synchronized 6-DOF data that infringed the relevant limitation. (Greenspoon Dec. Ex. B, at 21; Ex. C, at 21.) Contrary to Fitbit's arguments, this claim construction and claim-application contention never changed. There was no reason it should – Fitbit's apparent "synchronized display" (calorie burn) is precisely the same as the '882 Patent's preferred embodiment's "synchronized display" (calorie burn, aka "energy expenditure").

Specifically, the '882 Patent includes Fig. 9, which is a graphical representation of "the actual and predicted *energy expenditure* (based on data collected in 15 subjects) as determined by the method of the invention." (Greenspoon Dec. Ex. D, at 6:36-38, emphasis added.) The '882 Patent confirms that "energy expenditure" is calorie burn. (Greenspoon Dec. Ex. D, at 4:25-26, 27:28-39, 28:50-54.) One of the objects of the invention mentions calculating "energy expenditure," derived from "6-DOF data" utilized "in combination with physiological data, particularly heart rate" – wording that matches the two inputs that get transformed for the single output of the "synchronized display" claim limitation. (Greenspoon Dec. Ex. D, at 5:64-67.)

 "Energy expenditure" is indisputably the preferred embodiment's displayed "synchronized" information, as confirmed in the detailed description. It states that the "*display* is useful for displaying information about the device, such as low battery levels, or data processed by the microprocessor, such as heart rate and/or *energy expenditure*." (Greenspoon Dec. Ex. D, at 11:30-33, emphasis added.) The detailed description also states, "[i]nformation derived wholly *or partly* from the 6-DOF data (*e.g., energy expenditure*) may be *displayed* locally or transmitted to the remote unit for further processing, storage, and/or display." (Greenspoon Dec. Ex. D, at 13:57-60.) The whole purpose of such "synchronization" is "to monitor the physical

8

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

and physiological activity of subjects" (Greenspoon Dec. Ex. D, at 4:12-15) – a purpose in harmony with showing a user her calorie burn, derived from heart rate and 6-DOF information.

The '882 Patent does describe "alternatively" using 6-DOF to calculate a "virtual pelvis," and then synchronizing with physiological information to show "time referenced causal relationships, such as hypotensive events preceding falls." (Greenspoon Dec. Ex. D, at 14:42-49.) Yet Fitbit offers no reason to conclude that this "alternative" embodiment somehow limits the claim so that the preferred embodiment ("synchronized display" embodied as display of calorie burn) no longer falls within its scope.

Fitbit argues that SWT's infringement allegations with respect to limitation (g) ("synchronized display") are baseless because "Fitbit products do not display any 6-DOF information for a user's wrist relative to an inertial reference frame." (ECF No. 130, at 13:21-14:2.) Fitbit's argument is nonsensical because it does not correspond to what claim 8 actually says. Step (f) of claim 8 uses two inputs and transforms them into one: it synchronizes 6-DOF body-segment movement information "***with***" physiological information "***to obtain***" the "synchronized 6-DOF body-segment movement information and physiological information." (Greenspoon Dec. Ex. D, at claim limitation 8(f).) Step (g), in turn, then displays this calculation result in a "format comprehensible to humans." (Greenspoon Dec. Ex. D, at claim limitation 8(g).) This broad language does not require display of the originally-calculated 6-DOF information – only one of the two inputs into whatever information does get displayed.

Resolution of this dispute would, of course, require a full *Markman* hearing that never occurred here. A sanctions motion should not generate a detour into satellite litigation just to add another ground for seeking fees. Fitbit's presentation of its own untested interpretation of the patent's claims does not demonstrate that SWT's interpretation was frivolous. *iLOR*, 631 F.3d at 1379; *Creagi, Inc.*, 2014 U.S. Dist. LEXIS 77484, at *15-16.

SWT thus had a good faith, non-frivolous basis for the allegations made in its Complaint and First Amended Complaint. Neither pleading violated Rule 11.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### C.   SWT'S SIGNATURE ON THE JOINT CASE MANAGEMENT CONFERENCE STATEMENT COMPLIED WITH RULE 11

Fitbit next argues that SWT violated Rule 11 on September 26, 2017 when it "represented to the Court . . . that additional discovery was necessary." (ECF No. 130, at 4:10-15.) Fitbit presents itself as having attempted to avoid this litigation by candidly and openly providing SWT with complete proof of its non-infringement. That is simply not the case. Fitbit merely offered curated evidence it believed would support it, while resisting reasonable efforts to obtain related corroborating or impeaching evidence.

Shortly after SWT served the PICs, Fitbit's counsel asked to meet and confer on alleged deficiencies. At that April 12, 2017 meet-and-confer, Fitbit asked for clarification of the position with respect to the terms "anatomical reference frame" and "inertial reference frame," and asked for supplementation about evidence of infringement. Counsel does not recall Fitbit making statements about the lack of a gyroscope in the Blaze, or that sensors are not initialized on either product. (Vowell Decl. ¶ 10.) SWT provided the requested supplementation by April 21, 2017. (*Id*.)

Fitbit's motion relies heavily on a May 26, 2017 letter sent to SWT along with a declaration of Logan Niehaus. (ECF No. 130-10.) Fitbit insists that by offering the Niehaus declaration and an inspection of source code "at a mutually satisfactory time," it somehow removed any reasonable basis for SWT's positions. Fitbit also insists that SWT was too slow in reviewing the source code. Fitbit only tells half of the story.

First, Fitbit's letter did not explain why Mr. Niehaus suddenly materialized as a knowledgeable witness. He was not included in (nor ever amended into) Fitbit's Rule 26(a)(1) initial disclosures, which named a different person, Sheldon Yuen, as knowledgeable about how the products work. (Vowell Decl. Ex. C.)

Second, at the time of the May 26 letter, Fitbit had not produced *any* documents to SWT. (Vowell Decl. ¶ 19, Ex. E.) SWT was reasonable to believe that it needed documents in order for a source code review to be meaningful. (Bergeron Decl. ¶¶ 11-26.) During a meet-and-confer on June 5, 2017, SWT counsel discussed the letter and the declaration, and explained the need for documents from Fitbit in order to be able to understand and review the source code to evaluate

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Fitbit's position. (Vowell Decl. ¶ 20, Ex. F (June 5, 2017 Fitbit email acknowledging disagreement over "an appropriate path for verifying the statements made in our letter.").) Instead of demonstrating that its documentation also supported its assertion of non-infringement, Fitbit refused, insisting that no such documents were needed, and that the source code was self-explanatory. (Vowell Decl. ¶ 21, Ex. G (July 24, 2017 email recounting Fitbit's position that "access to the requested documents is not necessary prior to our reviewing source code.").)

As explained by Dr. Bergeron, SWT's desire for additional material was reasonable. (Bergeron Decl. ¶¶ 11-26.) The best practice for source code review concerning a consumer wearable embedded device demands the ability to consult at least electrical schematics. (Bergeron Decl. ¶ 14.) Best practices also ideally include the ability to consult non-source code algorithm documentation (*e.g.*, company "wiki's" or other internal specifications explaining in plain English what the algorithms do and how they work). (Bergeron Decl. ¶ 16.) This is to ensure that source code review is efficient and accurate, particularly in a case where, as an outsider, one cannot know the full extent of the task before beginning the actual inspection.

At the same time, the parties were litigating whether this case would remain in Virginia. Even during briefing on a co-pending transfer motion (eventually granted), the parties exchanged several emails related to SWT's continuing need for documents from Fitbit. (*E.g.*, Vowell Decl. Exs. E-H.) To the extent the Court later questioned why SWT could not "walk and chew gum" (ECF No. 132-4, at 20:6-12), *i.e.*, address discovery issues while briefing the transfer motion, the record shows that SWT chewed gum while walking. Proceeding too slowly is not, in any event, a ground for Rule 11 sanctions.

On July 10, 2017, SWT's persistence led to results. Three months after service of SWT's document requests, Fitbit produced documents. They consisted primarily of user manuals and other publicly available information, but still no electrical schematics or other internal documents (such as relevant algorithm-wiki's). (Vowell Decl. Ex. G.) While the production included some technical presentations, it did not include the key items necessary to perform a meaningful code analysis. What Fitbit did produce turned out to have inaccuracies. For example,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   an important specification sheet for the Blaze ███████████████████████

2   ██████████ (Greenspoon Decl. Ex. A, at 162:3-163:3.)

3        After a two-week review of these documents, SWT identified deficiencies to Fitbit by a

4   communication dated July 24, 2017. Fitbit maintained that it did not need to produce additional

5   information, and again stated (incorrectly, per Dr. Bergeron) that SWT only needed source code

6   for SWT's analysis. (Vowell Decl. Ex. G.) On August 8, 2017, SWT wrote again, with a detailed

7   explanation of why it needed further documentation to commence the source code review.

8   (Vowell Decl. Ex. H) The August 8 letter also demonstrated that SWT was not causing any

9   delay, contrary to a growing drumbeat of self-serving Fitbit statements that SWT was somehow

10  improperly delaying things.[3] (ECF Nos. 130-12, 130-13.)

11       The Western District of Virginia granted transfer on August 29, 2017. Fitbit finally

12  produced some, but still not all, electrical schematics on September 15, 2017.[4] (ECF No. 130-

13  14.) It was not apparent to counsel what this meant at the time, and was not explained until Mr.

14  Niehaus's later deposition, but every Blaze schematic had the label "NFF." (Vowell Decl. ¶ 12.)

15  This turned out to mean "non-form factor" – a term that indicates some sort of test or quality

16  control board, but not a mass-production device board. (Greenspoon Decl. Ex. A, at 72:2-12,

17  160:13-20.) Thus, Fitbit never produced schematics for the Blaze as sold. Ironically, Fitbit would

18  use the fact of its ***non***-production of Blaze device schematics against SWT, when SWT later

19  pointed to NFF schematics in summary judgment papers to demonstrate to the Court the

20  (undisputed) fact that they show a second 3-axis accelerometer. (*E.g.*, Dkt. No. 100, at 4:12-15,

21  7:23-25, 8:7-27, 13:9-13, Reply criticizing SWT for pointing to the only Blaze schematics Fitbit

22  ever produced.)

23       The September 15, 2017 production of schematics revealed to SWT that the Surge

24  contained three sensor chips – two of them being 3-axis accelerometers, and a third being an

---

[3]      It remains suspicious how reluctant Fitbit is to provide full internal documentation on the accused devices. Why is Fitbit insisting that information be reverse engineered when its own pre-dispute documents should presumably and authoritatively provide that information?

[4]      Fitbit has never offered an explanation for why it could not have simply produced these documents months earlier.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

InvenSense MPU9250. The MPU9250 is a nine-axis device, containing a 3-axis accelerometer, a 3-axis gyroscope and a 3-axis magnetometer. Knowing this fact turned out to be extremely helpful in the source code review, which revealed ██████████████████████████ ██████ (Greenspoon Decl. Ex. A, at 151:8-13.) Since the September 15, 2017 production continued to reveal (consistently) that each of the Surge and the Blaze contained enough sensor chips to calculate the claimed 6-DOF information, their production objectively bolstered the infringement inferences already reached.

This is the point in time when SWT informed the Court that more discovery was needed. That statement was not frivolous; it was true. At a minimum, SWT needed (1) to review the source-code and (2) to depose Mr. Niehaus. (Bergeron Decl. ¶¶ 11-26.) SWT also reasonably believed that it needed more documentation to fill in gaps so far. While the Court ultimately disagreed,[5] clearly SWT's desire for more discovery was not frivolous. SWT did not violate Rule 11 when it told the Court on September 26, 2017 that more discovery was needed.

### D.   SWT'S OPPOSITION TO SUMMARY JUDGMENT COMPLIED WITH RULE 11

Fitbit lastly argues that SWT violated Rule 11 when it filed its opposition to summary judgment on November 17, 2017. While this is unquestionably a point in time when SWT had more information than during the prior challenged actions, SWT still maintained a reasonable, non-frivolous basis for resisting summary judgment.

#### 1.   SWT was not required simply to accept Fitbit's "evidence" as true

Fitbit's motion implies that SWT was required to simply accept whatever "proof" Fitbit provided by declaration, even in the face of Fitbit's refusal to produce documents. That is not the law. In multiple contexts, courts and parties properly give no weight to untested written sworn statements. *Hussey v. Chase Manhattan Bank*, No. 02-7099, 2004 U.S. Dist. LEXIS 1150, at *6-7 (E.D. Pa. Jan. 13, 2004) (affidavit from plaintiff not competent to testify live because of health stricken, based on "the many possible deficiencies, suppressions, sources of error and

---

[5]     The Court denied a letter request to compel production of additional discoverable material that SWT still believed to be missing, over Fitbit's arguments that the technical material was not germane to the summary judgment issues. (ECF Nos. 86, 88.)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

untrustworthiness, which lie underneath the bare untested assertion of a witness, [that] may be best brought to light and exposed by the test of cross-examination"); *see also United States v. Phillipos*, 849 F.3d 464, 469 (1st Cir. 2017) (calling "untested" affidavit "illusory" and not entitling affiant to a preliminary hearing); *Glycobiosciences, Inc. v. Innocutis Holdings, LLC*, 146 F. Supp. 3d 221, 239 (D.D.C. 2015) ("declin[ing] to credit" "untested" declaration stating expert opinion on patent claim construction); *Vodak v. City of Chicago*, No. 03 C 2463, 2004 U.S. Dist. LEXIS 18070, at *12 (N.D. Ill. Sept. 9, 2004) (plaintiff "not required to take [adverse witness's] word for it when he claims that his opinion was not based on [particular information]. . . . Rather, plaintiffs are entitled to . . . cross-examination regarding his statements"); *ID Sec. Sys. Can., Inc. v. Checkpoint Sys.*, 198 F. Supp. 2d 598, 625-26 (E.D. Pa. 2002) (holding "untrustworthy" under the residual hearsay exception an affidavit of a witness "never tested on the crucible of cross examination" because he was employed by a party); *Merritt Forbes Co. v. Newman Inv. Sec., Inc.*, 604 F. Supp. 943, 952-53 (S.D.N.Y. 1985) (applying principle that "[a]ffidavits are so obviously incapable of [] thorough testing and inspection and, therefore, should not be dispositive of central issues of fact"); *cf. Daubert v. Merell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Here, Mr. Niehaus's May 26, 2017 affidavit simply established a need for cross-examination. And that cross-examination needed to commence *after* Fitbit set the stage for an efficient and meaningful source code review by producing schematics and other internal technical documents. The calendar of events shows that things happened within a reasonable time period, especially in light of Fitbit's first production of schematics on September 15, 2017.

### 2. Discovery after the CMC Statement made the facts less certain, not more

With the late production of electrical schematics, it was now a "mutually satisfactory time" to inspect the source code (a timing trigger Fitbit expressly proposed on May 26), albeit not an ideal time. Fitbit continued not to produce specifications or relevant wiki's. (Vowell Decl.

14

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

¶ 12.) Less than two weeks after the schematic production, on September 28, 2017, SWT counsel traveled across the country to conduct the first of two source code inspections at Fitbit counsel's offices. (Vowell Decl. ¶ 13.) This inspection made available only one version of code for each product. (Vowell Decl. Ex. D.) It was not known until later that there had been ████████████ ███████████████████████████████████████████████████████ (Greenspoon Decl. Ex. A, at 32:20-35:11.)

That inspection revealed that the Surge code had ██████████████████████ ███████████████ and that the Blaze code included ██████████████████████████ ████████████████. (Greenspoon Decl. Ex. A, at 102:25-112:13.) Fitbit did not make available any company personnel or subject area experts to walk SWT through the code on an informal basis, or answer any questions. (Vowell Decl. ¶ 14.) On October 2, 2017, a second SWT lawyer conducted SWT's second review of the same code. (Vowell Decl. ¶ 13.)

Fitbit suggests – citing no authority – a *per se* rule that retained experts were necessary for code review. (ECF No. 130, at 16:16-18.) Yet Fitbit overlooks that SWT counsel who inspected the code included one with a computer science degree, another with a strong technical degree that included code writing, and many combined years of experience in this type of code review. (Vowell Decl. ¶ 3.) Fitbit, of course, had never demanded in its May 26, 2017 letter that SWT bring along a retained expert – instead asking for ***counsel*** to verify its implausible statements with a source code review.

Before SWT could complete its investigation, Fitbit filed its summary judgment motion on October 17, 2017. The motion sought to establish as the definitive fact precluding infringement that Fitbit's products are "incapable" of calculating the claimed 6-DOF information, for lack of "active" second 3-axis sensors. (ECF No. 80, at 9:12-14.) The moving papers included a new Niehaus declaration to address the second sensors. This declaration contained material inaccuracies (to be discussed later). Also included was a declaration from "TechPats" (Mr. Demarest), who performed a "teardown" of the Surge and Blaze. The scant discussion of Mr. Demarest's "teardown" as to the Surge product was unreliable. It revealed nothing of the methodology he applied to conclude that the main processor never communicates

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    with the MPU9250. (Bergeron Decl. ¶¶ 39-44.) Mr. Niehaus, in fact, testified at his deposition to

2    the contrary (discussed later in detail), confirming that ███████████████████████

3    ████████████████████████████████ – a fact that runs counter to Mr.

4    Demarest's statement. (Greenspoon Decl. Ex. A, at 153:5-13.)

5         SWT took Mr. Niehaus's deposition on October 27, 2017. He confirmed that ██████

6    ███████████████████████████████████. (Greenspoon Decl.

7    Ex. A, at 32:20-35:11.) He also revealed that he made a "mistake" in his declaration regarding

8    ██████████████████████████████████████. (Greenspoon

9    Decl. Ex. A, at 153:21-154:3.) This "mistake" was material, since it negated the sole fact Mr.

10   Niehaus used to contend Surge noninfringement. (*See* ECF No. 80-54 ¶ 7, the retracted

11   testimony.)

12        Mr. Niehaus further explained that ██████████████████████████

13   █████████████████████████████████████████████

14   ████████████████████. (Greenspoon Decl. Ex. A, at 14:2-15:9; 138:5-24; 196:13-

15   197:9.) He admitted to being ████████████████████████████████

16   ███, and did not know whether ████████████████████████

17   ███████  (Greenspoon Decl. Ex. A, at 74:20-22; 80:23-81:2.) Finally, Mr. Niehaus had no

18   idea ███████████████████████████████████████

19   ███  (Greenspoon Decl. Ex. A, at 136:13-137:6; 139:14-24.) In effect, Fitbit offered Mr.

20   Niehaus as an employee-expert, tasked with reviewing otherwise-unfamiliar information and

21   reporting inferences and opinions that he formed. Those opinions rested on a thin basis, at best.

22   Mr. Niehaus did not appear credible to SWT, as SWT later reported in its summary judgment

23   opposition. Although the Court disagreed, this was a reasonable assessment given the deposition,

24   not sanctionable conduct.

25        Before lodging its opposition to summary judgment, SWT also hired one of the co-

26   inventors as an independent expert (with no stake in the outcome) – Jeffrey Monaco. Mr.

27   Monaco confirmed that the commercial Surge and Blaze devices had sufficient components

28   necessary to calculate the claimed 6-DOF information. This confirmed the previous bases for

16

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

reasonable inferences that SWT and counsel had formed. It also confronted and rebutted the main factual ground urged by Fitbit – supposedly "incapability."

Though SWT presented the bases for its reasonable inferences of infringement to the Court, and provided a sufficient showing (it believed) to demonstrate that Fitbit had not competently rebutted these inferences with credible admissible evidence, the Court granted summary judgment. This brief does not challenge that decision; however, losing summary judgment does not mean the claim was frivolous. SWT believed, and still believes, it had a sufficient basis for its claim as described above. SWT's litigation conduct was that of a party trying to win, not trying to harass or burden an opponent for any improper purpose.

> **3.      Inconsistencies between the initial PICs and the accused devices do not demonstrate that the underlying claim of infringement was frivolous**

Fitbit points out that SWT's PICs stated that the Blaze uses a 3-axis gyroscope instead of more generically a 3-axis sensor. As it turned out, Fitbit public statements were wrong, and the Blaze does not have a gyroscope. It does have another 3-axis sensor (a magnetometer) that could combine with the 3-axis accelerometer to allow 6-DOF calculations. Both Fitbit and the Court were critical of SWT for not amending its Blaze PICs prior to opposing summary judgment.

Amending the Blaze PICs earlier might have made it easier to oppose summary judgment, but SWT respectfully suggests that delay in doing so does not render the underlying claims frivolous. SWT made its PICs on publicly available information from Fitbit. Notably, there were no patent local rules in the Western District of Virginia (the case's initial forum), but the parties agreed to exchange contentions and claim construction disclosures as part of the scheduling order without reference to any particular district's local rules.[6]

---

[6]      As it turns out, Fitbit's own early invalidity contentions would have been deemed noncompliant under Northern District of California rules, as they omit any charts. Northern District of California Patent Local Rule 3-3(c). Fitbit never amended them. Fitbit never provided initial invalidity contentions in chart form, as would comply with Northern District of California Patent Local Rules. Those would have been due on December 1, 2017 (*i.e.*, 45 days after SWT's PICs might ostensibly have become SWT's Northern District of California LPR PICs). If Fitbit believed that Northern District of California LPRs were in force despite the *de facto* stay, along with their contention-amendment protocols, it would have served chart-form invalidity contentions by December 1, 2017.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

The October 3, 2017 CMC would have ordinarily have been a trigger event starting a 14-day clock for a plaintiff's initial service of PICs. Northern District of California Patent Local Rule 3-1. But Fitbit's prior CMC statement suggested permitting an early summary judgment motion "before discovery proceeds any further" (ECF No. 68, at 4:20-22), which the Court endorsed at the CMC, stating that "it seemed to make sense to proceed *as the defendant was proposing*, by teeing up an early summary judgment motion." (ECF No. 130-24, at 2:18-22.) This appeared to approve a *de facto* stay of discovery, other than whatever Fitbit might unilaterally choose to provide to support its summary judgment position. The Court later denied SWT's request to compel otherwise-discoverable information, over Fitbit's objection that the material was not germane to the specific summary judgment issues. (ECF Nos. 86, 88.)

At no time did this Court order the parties to comply with the Northern District patent rules or set deadlines for converting the PICs made in Virginia into ones compliant with this Court's rules. Yet even if that had happened, at most SWT was late (but still within the discovery period) when correcting its Blaze PICs (disclosing the corrected claims in its motion-opposition papers).[7] While Fitbit raised this as a technical defect, it made no pretense of being unaware that SWT made the same contention about the other sensors present in the devices. A party has no obligation to supplement contention discovery when it has "otherwise [] made [a contention] known to the other parties *during the discovery process or in writing*." Fed. R. Civ. P. 26(e)(1)(A) (emphasis added). At least SWT's opposition brief to the early summary judgment motion satisfied both criteria of updating SWT's Blaze contentions "during the discovery process" and "in writing."[8] *Tritek Techs., Inc. v. United* States, 63 Fed. Cl. 740, 746-47 (Fed. Cl. 2005) (under Rule 26(e) allowing non-infringement theory revealed only in pre-*Markman* summary judgment motion and not in formal contention interrogatory answers).

---

[7]    Fitbit does not argue that the PICs themselves violated Rule 11; nor could it, as Rule 11 does not apply to discovery exchanges amongst the parties.

[8]    Any interpretation or application of the Patent Local Rules inconsistent with Rule 26(e) would not be valid. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Even if the "otherwise made known" carveout from Rule 26(e)(1)(A) did not apply, that would not support Fitbit's Rule 11 motion. The Court concluded that SWT could not defeat summary judgment by changing its contentions, but a timing issue does not make the substantive claims frivolous. "The fact that [a patentee's] claim-construction theories changed over the course of the litigation does not make its initial or subsequent constructions unreasonable in light of the information available at the time. Such changes are common as litigation proceeds . . . ." *PrinterOn Inc. v. Breezyprint Corp.*, 93 F. Supp. 3d 658, 711 (S.D. Tex. 2015) (*citing Lava Trading Co. v. Sonic Trading Mngmt., LLC*, 445 F.3d 1348, 1353 (Fed. Cir. 2006)).

SWT also made no inconsistent claim construction argument in the relevant Patent Office paper. The paper Fitbit quotes out of context shows explicitly that SWT was not taking a position on claim construction of the "synchronized display" element within that tribunal. (ECF No. 130-16, at 10, "Patent Owner elects not to offer a proposed construction in this response . . . .") Rather, SWT simply held up opponent Tom-Tom's construction for scrutiny, and showed that it resulted in a contradiction with the specification. (ECF No. 130-16, at 8-10.) Fitbit's gross misunderstanding of the "synchronized display" limitation and SWT's positions regarding it should not lead to any conclusion of frivolousness.

**4.      SWT's opposition to summary judgment was not frivolous**

The Court rejected SWT's arguments in opposition to summary judgment. That does not, however, make them frivolous.[9]

In its summary judgment papers, Fitbit never submitted its source code, relying solely on Mr. Niehaus to tell the Court how the code performed. SWT impeached Mr. Niehaus. SWT caused him to recant the factual premise of his declaration testimony as to the Surge. This supported the reasonableness of SWT's decision not to nonsuit Fitbit after summary judgment.

At least as to the Surge, and the implausible contention that a particular sensor is never used (the InvenSense MPU9250), SWT negated that testimony. Nothing remained of any

---

[9]      The summary judgment motion did not address Fitbit's new "displaying" limitation argument, and thus *a fortiori* nothing in the opposition spoke to that argument. On summary judgment, the non-movant's burden is to respond to the motion, not address issues not raised in it. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

19

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  contention that the software does not initialize the MPU9250, and therefore of the stated ground

2  Mr. Niehaus offered for summary judgment. Again, this is not to relitigate the merits. But rather,

3  impeachment of the only employee testimony offered to support implausible assertions about

4  software lends significant weight to the reasonableness of declining to nonsuit Fitbit.

5          As to the Surge and the MPU9250, Mr. Niehaus's summary judgment declaration offered

6  only one reasoned ground regarding noninfringement and the MPU9250 sensor chip – ████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  ████████████████████████████  (ECF No. 80-54, at ¶ 7.)

11         Under cross-examination, Mr. Niehaus retracted this statement. Mr. Niehaus first

12  confirmed that ██████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████  (Greenspoon Decl. Ex.

15  A, at 138:5-24; 196:13-197:9.) Mr. Niehaus ██████████████████████

16  ████████████████████████  (Greenspoon Decl. Ex. A, at 142:12-154:12.)

17         Fitbit dismisses this retraction as an "inconsequential error" that was "immaterial to his

18  conclusions." (ECF No. 130, at 18:12-14.) Fitbit is wrong. The first retraction led to a second

19  one – that Mr. Niehaus ████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21         Q. And now let me borrow that back from you and I'll point you to another

22  ████████████  ██  ██  ██  ██     ██  ██  ██  ████████

23  ████████████████████████████████████████████

24  ████████

25  ████

26  ████████████████████████████████████████████

27  ████

28  ████████████████████████████████

OPPOSITION TO RENEWED MOTION FOR RULE 11 SANCTIONS/ CASE NO. 3:17-CV-05068-VC

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED



(Greenspoon Decl. Ex. A, at 152:18-154:12 (emphasis added).)

 Fitbit's basis for moving for summary judgment was "incorrect" and a "mistake." SWT was entitled to oppose the motion and argue these points. *See Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1024 (Fed. Cir. 2009) (jury entitled to disbelieve a party's expert if it chooses); *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (court not required to accept unsupported expert assertions). Mr. Niehaus testified about ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Greenspoon Decl. Ex. A, at 138:5-24; 196:13-197:9.) Nor could he fathom any reason why ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮. (Greenspoon Decl. Ex. A, at 136:13-137:6; 139:14-24.) Mr. Niehaus also was ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (Greenspoon Decl. Ex. A, at 74:20-22; 80:23-81:2.)

 Fitbit's other direct evidence about the Surge also appeared unreliable. Mr. Demarest testified that a particular pin always stays high in the MPU9250, thus precluding any processor-sensor communications. Not only does Mr. Niehaus's admission about ▮▮▮▮▮▮▮▮▮▮▮▮

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

████████████ contradict this (*i.e.*, ████████████████

████████████ ). The Demarest testimony did not disclose the methodology for the testing.

(Bergeron Decl. ¶¶ 39-44 (noting among other things that bench testing while the device was still

would not be representative of device operation).) At the very least, Fitbit's May 2017 deletion

from Surge product literature of its ***true*** statement that the Surge had a second 3-axis sensor (a

gyroscope) underscores that the pre-deletion literature implied that the product uses that chip.

Despite the deletion, the prior product literature still carries weight as a party admission. Fitbit

deleted a true statement from Surge product literature that it ***has*** a 3-axis gyroscope, showing

that Fitbit wanted to distance itself from an admission that it ***uses*** the gyroscope.

As to either the Surge or the Blaze, it was nowhere near a foreordained conclusion that

this Court would find Mr. Niehaus's testimony credible enough to refute SWT's circumstantial

evidence that both the Surge and the Blaze calculate 6-DOF as claimed. This was not solely

because of the undisputed fact that both products contain sufficient hardware to calculate 6-DOF

as claimed. The cross-examination at deposition also established that as to both products, code

existed ████████████████████████████ .

Rule 11 allowed SWT to oppose summary judgment and press forward seeking full

discovery to prove its claims. SWT did not violate Rule 11 by opposing summary judgment.

## III.  TO THE EXTENT ANY SANCTIONS ARE WARRANTED, FITBIT HAS FAILED TO PROVIDE A SUFFICIENT RECORD TO AWARD THEM

### A.  FITBIT'S ARGUMENTS FOR "MATERIAL" SANCTIONS ARE BASELESS

Fitbit asks the Court to impose "a very material sanction" based on four cursory

arguments. None of them adds any heft to Fitbit's motion.

First, Fitbit argues that heavy sanctions are justified because SWT is owned by Wi-LAN,

Inc. No authority is cited for the undoubtedly unconstitutional assertion that a sanction against

SWT may be based on who owns the company. Rule 11 certainly does not authorize the Court to

base its sanction on the ownership of a party.

Second, Fitbit argues that SWT's counsel have prosecuted other lawsuits on the same

patent against other company's products. It offers no evidence that any such suit was ever found

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    sanctionable or frivolous and, indeed, provides no information about any of those suits. SWT has

2    a constitutional right to petition, and Fitbit likewise presents no authority that allows the Court to

3    punish SWT for pursuing its patent rights against other parties. Rule 11 certainly provides no

4    such authority. *See Glob. Touch Sols., LLC v. Toshiba Corp.*, 109 F. Supp. 3d 882, 887 (E.D. Va.

5    2015) (observing that, as a result of the joinder provision of the America Invents Act, "it appears

6    that the serial filing of separate patent infringement actions in the same court, on or about the

7    same date, against different corporate defendants, has become the new normal in patent

8    infringement litigation"); *Phillips Petroleum Co. v. Esso Standard Oil Co.*, 91 F. Supp. 215, 217-

9    18 (D. Md. 1950) (successful defendant in patent infringement case was not entitled to attorney's

10   fees even though losing patentee brought other actions involving similar issues based on same

11   patent in other forums including one resulting in a judgment of invalidity and noninfringement;

12   fees were only appropriate if vexatious and unjustified litigation was clearly shown); *compare*

13   *Doering v. Union Cty. Bd. of Chosen Freeholders*, 857 F.2d 191, 197 n.6 (3d Cir. 1988) (the

14   "district court may consider … the attorney's history of filing frivolous actions or alternatively,

15   his or her good reputation.").

16          Third, Fitbit argues that SWT and its counsel were warned not to pursue this case. As

17   discussed in detail above, the information provided with Fitbit's "warning" was incomplete and

18   inaccurate, and SWT was entitled to dig deeper. Again, Fitbit cites no authority that "failing" to

19   capitulate to Fitbit's threats justifies increasing any sanction.

20          Finally, Fitbit argues that this Court has sanctioned other litigants, as if the identity of the

21   specific District Judge hearing the matter had some bearing on what, if any, sanctions are

22   appropriate. It does not.

23          SWT's counsel are experienced patent litigators who have never been subject to a Rule

24   11 sanction. (Declaration of Jonathan Suder filed herewith ¶¶ 4-21; Vowell Decl. ¶ 3.)  They

25   have tried and won numerous cases. In scenarios where an opponent claims to hold case

26   dispositive internal information, they request it early so that they may act upon it promptly in

27   consultation with the client to nonsuit, if that is actually appropriate. (Suder Decl. ¶ 15.) Neither

28   SWT nor its counsel need any incentive to avoid unsuccessful, much less frivolous, cases.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3

SWT has explained in detail why it believed its conduct was appropriate at each challenged stage. Neither SWT nor its counsel are being "unrepentant," and Fitbit has not demonstrated any facts that would justify any sanction, much less a material one.[10]

4

5

### B.     FITBIT HAS PROVIDED THE COURT WITH NO WAY TO CALCULATE ITS FEES WITH REFERENCE TO EACH CHALLENGED PLEADING

6

7

8

As discussed above, no sanction should be awarded. In the event, however, that the Court determines to award some sanction, Fitbit has provided no sufficient evidentiary basis to base that sanction on Fitbit's attorneys' fees and costs because Fitbit's declaration concerning fees and costs fails to break them down based on when they were incurred.

9

10

11

12

13

14

15

16

The only information provided by Fitbit concerning its fees and costs is in the Declaration of Eugene Novikov (ECF 132-1). Mr. Novikov does not provide any contemporaneous billing statements, nor any summaries describing when time was incurred. Instead, his declaration presents a hearsay report of the time records from himself and others at his firm for twelve "task categories": (1) analysis and investigation, (2) pleadings and motion to dismiss, (3) CMCs and other procedural matters, (4) written discovery, (5) motion to transfer, (6) motion for summary judgment, (7) settlement, (8) rule 11 motion, (9) case management, (10) claim construction, (11) document collection, review, and production, and (12) fees motion.

17

18

19

20

21

22

23

24

No information is provided as to when any of this work was done in relation to the four challenged pleadings for which Fitbit seeks Rule 11 sanctions. Nor is any provided to separate time spent on a product-by-product basis (*i.e.*, Surge versus Blaze). It is not possible based on the record before the Court, for example, for the Court to distinguish time spent after the opposition to summary judgment from time spent before it. Even if the Court were to determine that SWT should have dismissed the case at some point, Fitbit has not provided enough information for either SWT or the Court to analyze what, if any, fees were caused by continuing past that point.

25

26

Nor is it possible for the Court to analyze any of the time to see whether it was reasonable. We note, for example, that Fitbit's two fee motions account for 174.6 attorney and

27

28

---

[10]     In its conclusion, and without any authority, Fitbit asks the Court to impose a "scarlet letter" on SWT by not only sanctioning it, but also requiring it to provide the sanctions order to all other courts it appears before.

24

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

64.5 paralegal hours, more than any other "task code" during the entire case except for summary judgment. Spending 20% of the overall time on the case seeking sanctions seems neither reasonable nor consistent with Fitbit's argument that the case was frivolous. "[A]n award of fees is limited to fees 'reasonably' expended as a result of an unwarranted filing." *Hunt v. PNC Bank*, No. SACV 16-02093 JVS (JCGx), 2017 U.S. Dist. LEXIS 171841, at *3 (C.D. Cal. Mar. 23, 2017). The Court would encourage a cottage industry in fee motions – a true "moral hazard" – if it endorsed runaway billings for "fees on fees."

In all events, Rule 11 "is not a fee-shifting measure." *Cooney v. Casady*, 735 F.3d 514, 523 (7th Cir. 2013); *Miltier v. Downes*, 935 F.2d 660, 665 (4th Cir. 1991). "The central purpose of Rule 11 sanctions is 'to deter baseless filings in District Court,' but courts must also be sensitive to the dangers of chilling vigorous advocacy." *Sharnese v. California*, 547 F. App'x 820, 824 (9th Cir. 2013) (citations omitted). As the rule itself specifies, "[a] sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. Proc. 11(c)(4).

## IV.   CONCLUSION

For the reasons set forth above, the Court should deny Fitbit's renewed motion for Rule 11 sanctions.

Dated: March 28, 2018                    Respectfully submitted,

                                         */s/ Robert P. Greenspoon*
                                         Robert P. Greenspoon
                                         William W. Flachsbart
                                         Jonathan Hill
                                         *Admitted Pro Hac Vice*
                                         **Flachsbart & Greenspoon, LLC**
                                         333 N. Michigan Ave. - 27th Floor
                                         Chicago, IL 60601-3901
                                         (312) 551-9500
                                         rpg@fg-law.com
                                         wwf@fg-law.com
                                         jh@fg-law.com

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lewis E. Hudnell, III (CASBN 218736)
Hudnell Law Group P.C.
800 W. El Camino Real, Suite 180
Mountain View, California 94040
T: 650.564.7720
F: 347.772.3034
lewis@hudnelllaw.com

OPPOSITION TO RENEWED MOTION FOR RULE 11 SANCTIONS/ CASE NO. 3:17-CV-05068-VC

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

## **CERTIFICATE OF SERVICE**

2

3       The undersigned certifies that on March 28, 2018, I caused a true and correct copy of the

4   foregoing document to be sent *via* the Court's ECF system to counsel of record.

5

6                                       /s/ *Robert P. Greenspoon*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28